[No. B024782. Second Dist., Div. Seven. Feb. 18, 1988.]

SHERMAN JONES, Plaintiff and Appellant, v.
LOS ANGELES COMMUNITY COLLEGE DISTRICT et al.,
Defendants and Appellants.

COUNSEL

Masry & Vititoe and Edward L. Masry for Plaintiff and Appellant.

Mary L. Dowell and Warren S. Kinsler for Defendants and Appellants.

OPINION

LILLIE, P. J.— ██ ██ ██ ██ Plaintiff appeals from summary judgment[1] entered in favor of defendants on his complaint for racial discrimination in employment in violation of Government Code section 12900 et seq., on the ground that workers' compensation provides the exclusive remedy for plaintiff's injuries.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Employment History.*

After occasional work as a temporary painter for the Los Angeles Community College District (hereinafter, District) beginning in 1974, plaintiff began work as a regular painter at the Harbor College campus of defendant District in October 1980 under the immediate supervision of defendant

---

[1] On August 14, 1986, the court issued "Proposed Order Denying Defendants' Motion for Summary Judgment and Granting, in Part, Summary Adjudication of Issues." Plaintiff filed timely notice of motion to reconsider the August 14 order. On October 14, 1986, the motion came on for hearing and the matter was taken under submission. On October 17, 1986, the court issued a decision and a memorandum in which it reaffirmed its earlier ruling, which the court in fact did reconsider, despite the fact that the decision stated, "Motion for Reconsideration is denied." The parties were apparently mailed notice of the decision on October 17. Both the August 14 and October 17 rulings addressed the same issue—the exclusivity of the workers' compensation remedy. However, because all parties agree that the effect of the summary adjudication that workers' compensation provides plaintiff's exclusive remedy is to bar plaintiff from any recovery against these defendants, it is in legal effect a final judgment despite its form as a purported order granting summary adjudication of issues. (See *Trimble* v. *Steinfeldt* (1986) 178 Cal.App.3d 646, 649-650 [224 Cal.Rptr. 195].)

We thus treat the October 17, 1986, ruling in combination with the August 14 order, as reaffirmed on October 17, as the appealable final judgment. Plaintiff's notice of appeal, filed on December 4, 1986, states that he "hereby appeals . . . in the above-entitled matter," without specifying the precise order or judgment from which appeal is taken. Because the same issue was presented to the court on August 14 and October 17, which issue all parties have addressed on appeal, and because a notice of appeal should be construed liberally in favor of its sufficiency (Cal. Rules of Court, rule 1(a)), we construe the notice to refer to the final appealable judgment and conclude the notice of appeal was timely filed on December 4, 1986. (Cal. Rules of Court, rule 2(a).) We thus reject respondents' arguments that appeal is taken from a nonappealable order and that the notice of appeal is not timely filed.

William Putren. Putren also supervised a temporary painter, Mark Bronder, who, starting on plaintiff's second day of employment, used racially derogatory language, including the word "nigger," in talking to or about plaintiff. When plaintiff, who is Black, discussed Bronder's treatment of him with Putren later that day, Putren told him not to take offense because Bronder was "impetuous" and the use of such racial and ethnic slurs was Bronder's "natural way of speaking." Bronder's derogatory language continued and following each of plaintiff's complaints, Putren would speak to Bronder, directing him to stop derogatory comments of any sort and to work cooperatively with plaintiff. At the time Putren had recommended hiring Bronder, Putren knew Bronder was unsophisticated and had experienced some trouble with the law.

Putren claimed he did not dismiss Bronder immediately for several reasons: He felt he could help Bronder adjust his behavior and learn the painting trade, thereby keeping him out of further trouble with the law; he also knew that because of district-wide financial problems, he would not be able to fill the vacancy created if one of his painters were dismissed. In March 1981, Putren realized his efforts to get Bronder to work cooperatively with plaintiff were not successful and began to give the two employees separate assignments whenever possible. Plaintiff claimed that Putren made it clear to him, through express statements and conduct, that plaintiff would have to tolerate Bronder's abuses. Plaintiff also maintained that on numerous occasions Putren and Bronder, who are White, would discuss plaintiff and his race in a derogatory manner in plaintiff's presence, including charges that plaintiff was involved in pilfering then taking place on the campus. Plaintiff was aware that other employees were stealing supplies on campus and maintained that both Putren and Dr. J. Quentin Mason, vice president of administration of the Harbor College campus, knew of such stealing and knew that plaintiff was familiar with such occurrences, but they took no action in the matter. Plaintiff also claimed that he was never separated from Bronder; Bronder simply stayed away from campus and got paid for it, while plaintiff did his work. Plaintiff claimed his work load increased substantially after his complaints about Bronder, he was given shorter and more oppressive deadlines, and he was singled out to be monitored during his work, which he found very humiliating.

On April 2, 1981, plaintiff submitted a written request to transfer to another campus in the district. The request was acknowledged in May 1981 when Charles Campbell, building and grounds administrator at Harbor College, and Putren's supervisor, agreed to release plaintiff for transfer if transfer is negotiated, and plaintiff's name was added to an eligibility list from which his name could have been selected had an opening occurred at

another campus or had another painter been willing to transfer to Harbor College campus. In April 1981, plaintiff also complained to Campbell of his problems with Bronder. In November 1981, in response to plaintiff's complaints, Putren gave Bronder the choice of quitting or being dismissed and Bronder chose to quit.

On September 15, 1982, Dr. Mason saw plaintiff talking to another employee at a time when they should have been working. Mason told Putren that if he did not get plaintiff back to work, he would write a notice of unsatisfactory service against Putren. Later that day, plaintiff met with Mason and raised a number of complaints, including Putren's assignment to him of unduly onerous job tasks and racial bias. Mason told plaintiff to put his complaints in writing so that they could be addressed in a more ordered fashion at a meeting the next morning in Campbell's office. On the morning of September 16, Mason set up a tape recorder in Campbell's office where Campbell and Putren were also in attendance. According to Mason, after plaintiff arrived, Mason told him the meeting would be taped and everyone present could have a copy of the tape; plaintiff responded, "No, thank you," and left the room, returned a few moments later, placed some keys on the table, left again and nothing more was said. According to plaintiff, plaintiff requested that Mason read onto the tape recorder his right to counsel and/or representation, but Mason refused.

Plaintiff claims and apparently believes that he was suspended on September 16. Putren claims that later on September 16, plaintiff came to Putren's office, said he had spoken with Campbell, and plaintiff did not know whether he would come in to work the next day. Putren did not see or hear from plaintiff until October 20, 1982; on September 23, 1982, Mason told Putren that plaintiff was granted an illness leave from September 23 through October 19, for which period of time he was paid. Defendants maintain that plaintiff was never suspended, and that no disciplinary action was taken against him, as suspension is a disciplinary device during which an employee is not paid.

After returning to work on October 20, plaintiff worked, with frequent absences for illness leave, until August 30, 1983, when he sustained an injury to his left knee. From August 31 until March 9, 1985, plaintiff was on industrial accident leave for most of the time and worked only 29½ days between August 31, 1982, and December 31, 1983. In 1984, plaintiff was on industrial accident leave for 237 out of 262 working days. Having exhausted all leave benefits on March 9, 1985, plaintiff was placed on a 39-month reemployment list pursuant to an agreement between plaintiff's union and

the District. On January 2, 1986, plaintiff was placed on the Public Employees' Retirement System disability retirement roll. He apparently continues to remain disabled from returning to work.

Plaintiff filed three applications for adjudication of claim with the Workers' Compensation Appeals Board, which are apparently still pending before the Board. The first application, dated February 3, 1983, claims plaintiff sustained injury to his "emotions (psyche)" due to "repetitive occupational stresses" from October 1982 through February 3, 1983. An application filed the same day claimed the same type of injury for the period from September 1981 through September 1982. An application dated February 9, 1984, claims injury to plaintiff's left knee while he was stripping paint on August 30, 1983. As of March 1986, the District has paid plaintiff $11,564 in temporary disability benefits, $7,808.64 in vocational rehabilitation temporary disability benefits, and $2,730 in advances on permanent disability; the District has also paid $33,486.42 in medical bills for plaintiff.

B. *Administrative Remedies.*

On October 7, 1982, plaintiff submitted a written discrimination complaint to the District and on October 21, 1982, he again requested in writing a transfer to another campus, stating on the form that the reason for the request was "E.E.O. Follow/Up. Administrative Transfer. Best Interest of the District." An October 22, 1982, letter to plaintiff from the affirmative action representative of Los Angeles Harbor College acknowledged receipt of plaintiff's charges of discrimination and stated that administrative review of the matter will commence no later than October 27. A November 4, 1982, letter to plaintiff from staff counsel of the chancellor's office stated that plaintiff's complaint has been forwarded to the District for their investigation and resolution; the board of governors encourages the districts to resolve charges of unlawful discrimination at the local level; that plaintiff is urged to work with the District to resolve the matter; the District has until February 1, 1983, to complete its investigation, when it will notify plaintiff of its resolution; and if plaintiff is not satisfied, he must file his complaint with the Department of Fair Employment and Housing.

Our record does not indicate the District's resolution of plaintiff's complaint. On February 22, 1983, plaintiff filed a charge of discrimination with the Department of Fair Employment and Housing (DFEH), in which he claimed racial harassment at the hands of Bronder, preferential treatment of Bronder by his superiors, who refused to reprimand Bronder and gave plaintiff poor evaluations, denial of transfer requests, and an unjust three-

week suspension beginning September 23, 1982. By letter dated August 5, 1983, the DFEH informed plaintiff that if he decides to file a private lawsuit, he must file his case within one year from the date of the letter. By letter dated January 25, 1984, the DFEH informed plaintiff that his case was being closed "on the basis of insufficient evidence to prove violation of the statute."

## C. Trial Court Proceedings.

On July 5, 1984, plaintiff filed a complaint for damages against defendants and plaintiff's union containing five causes of action. The union is not a party to this appeal. The first two causes of action are for race discrimination in employment in violation of state law; the third is for violation of Labor Code section 970; the fourth, against the union and the individual defendants, is for intentional interference with business relationships; the fifth, against the union only, is for breach of fiduciary duty. Defendants District, Putren, Campbell, and Mason demurred to the complaint. The court overruled the demurrer as to the first and second causes of action, sustained it as to the third and fourth, and the parties stipulated to strike the punitive damages allegations from the first and second causes of action. Although plaintiff was given leave to amend as to the third and fourth causes of action, plaintiff chose not to do so, and defendants answered the complaint admitting that plaintiff is a Black American hired as a full-time painter with Putren as his immediate supervisor and that the District is an employer within Government Code section 12926, subdivision (c), but defendants denied all other allegations and raised as an affirmative defense, inter alia, that plaintiff's exclusive remedy is under the Workers' Compensation laws. In April 1986 defendants filed motion for summary judgment or in the alternative for summary adjudication of issues. Two of the issues sought to be adjudicated were that the court was without jurisdiction to award plaintiff general damages because of the exclusive remedy provisions of the Labor Code and that the individual defendants, insofar as they are sued for acts taken in their individual capacities were not acting as "employers" and cannot be liable for employment discrimination. Although the court appeared to acknowledge that an adjudication that workers' compensation is plaintiff's exclusive remedy left nothing of plaintiff's case against defendants, the court refused to grant summary judgment, but did grant summary adjudication of the above two issues. An order denying summary judgment and granting, in part, summary adjudication of issues was filed on August 14, 1986. Plaintiff filed motion to reconsider, which was heard on October 14, 1986. After extensive argument on the issue of the exclusivity of the workers' compensation remedy, the court took the matter under submission. On October 17, the court issued its decision and one-page memo-

randum on the issue of the exclusive remedy of workers' compensation, reaffirming its earlier order. Plaintiff filed a notice of appeal on December 4, 1986.

## I

### SUMMARY JUDGMENT

■ The matter to be determined by the trial court on a motion for summary judgment is whether facts have been presented which give rise to a triable issue. The court may not pass upon the issue itself. (*Empire West* v. *Southern California Gas Co.* (1974) 12 Cal.3d 805, 808 [117 Cal.Rptr. 423, 528 P.2d 31].) ■ Summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor. Where as here, the moving party is a defendant, he must either negate a necessary element of the plaintiff's case or state a complete defense. (*Parsons Manufacturing Corp.* v. *Superior Court* (1984) 156 Cal.App.3d 1151, 1157 [203 Cal.Rptr. 419].) We thus proceed to examine the issues raised by defendants' motion, which are reasserted in their reply brief on appeal, to determine whether a triable issue of fact exists and whether defendants are entitled to a judgment in their favor.

## II

### EXCLUSIVITY OF WORKERS' COMPENSATION REMEDY

■ The trial court's ruling was based on the determination that Jones's claims of discrimination were barred as a matter of law in that workers' compensation provided his exclusive remedy. Appellant's primary contention on appeal is that such determination was error.

"Under workers' compensation an employer is liable for injuries to its employee arising out of and in the course of employment. ([Lab. Code,] § 3600.) Where the conditions of workers' compensation exist, the right to recover such compensation is the employee's exclusive remedy against the employer for such injuries. (§ 3602.) . . . The workers' compensation act (§ 3200 et seq.) compensates employees for injuries arising out of unsafe work place conditions, including enhanced compensation under section 4553 in cases involving serious and willful employer misconduct." (*Spratley* v. *Winchell Donut House, Inc.* (1987) 188 Cal.App.3d 1408, 1411-1412 [234 Cal.Rptr. 121].) Labor Code section 3601 makes workers' compensation the exclusive remedy except in a few narrowly drawn circumstances, which

statutory exceptions are not put in issue herein. ■ Case law construing the section has greatly expanded the exceptions to the exclusivity rule. (*Hart* v. *National Mortgage & Land Co.* (1987) 189 Cal.App.3d 1420, 1427-1428 [235 Cal.Rptr. 68].) "If the injuries were emotional, it was recognized that workers' compensation provided no remedy. In order to provide some type of compensation to the injured employee, the courts created an exception to the exclusivity doctrine." (*Id.,* at p. 1428, citing *Renteria* v. *County of Orange* (1978) 82 Cal.App.3d 833 [147 Cal.Rptr. 447].)

In the recent California Supreme Court decision of *Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148 [233 Cal.Rptr. 308, 729 P.2d 743], an employee sued his employer for mental and physical disability, alleging that his employer's harassment of him during union negotiations and unfounded disciplinary actions taken against him, including demotions, humiliating and menial job assignments, and salary reductions, caused him emotional and physical injuries culminating in a cerebral vascular attack that rendered him unable to move other than to blink his eyes. The court concluded that "when the misconduct attributed to the employer is actions which are a normal part of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances, an employee suffering emotional distress causing disability may not avoid the exclusive remedy provisions of the Labor Code by characterizing the employer's decisions as manifestly unfair, outrageous, harassment, or intended to cause emotional disturbance resulting in disability. The basis of compensation and the exclusive remedy provisions is an injury sustained and arising out of the course of employment (former Lab. Code, §§ 3600, 3601), and when the essence of the wrong is personal physical injury or death, the action is barred by the exclusiveness clause no matter what its name or technical form if the usual conditions of coverage are satisfied." (43 Cal.3d at p. 160.)

The language in *Cole* suggests the court is drawing a distinction between emotional distress resulting in "disability," which is covered by workers' compensation, and emotional distress which does not result in such disability. The court in *Cole* also has apparently adopted an "alternative action theory" pursuant to which courts must now engage in a two-step analysis to determine whether a tort action is authorized: "First, they should ask whether the tort plaintiff sustained 'personal injury' under the workers' compensation statute. If not, tort recovery is allowed. If 'personal injury' was sustained, then the courts should determine whether the injury 'arose out of employment.' If the injury 'arose out of employment,' tort recovery is denied. If it did not, tort recovery is permitted even though the injury is a type of harm covered by workers' compensation." (Love, *Actions for Non-*

*physical Harm*: *The Relationship Between the Tort System and No-Fault Compensation* (*With an Emphasis on Workers' Compensation*) (1985) 73 Cal.L.Rev. 857, 873-874.)

■ Of particular significance to the instant case is the statement in *Cole* that the court is limiting its discussion only to common law causes of action and that it does not decide whether the exclusive remedy provisions of the Labor Code bar causes of action created by statute. (43 Cal.3d at p. 157, fn. 9.)

■ In the instant case, the complaint alleges that defendants' racial discrimination, harassment and retaliation caused plaintiff not only economic damages, but also "physical and emotional damage." As to the injury to "his body and knees, and shock and injuries to his nervous system and person," the complaint alleges that "said injuries will result in some permanent disability to plaintiff." We do not read the complaint as alleging plaintiff's emotional injuries will render him disabled, but only that his *physical* injuries will result in disability. Thus, even were we to find *Cole* applicable to the instant case, as urged by respondents,[2] we would conclude that they did not meet their burden of proof on summary judgment to establish that the conditions of compensation rendering them subject to the protections of the workers' compensation statutes existed. (*Doney* v. *Tambouratgis* (1979) 23 Cal.3d 91, 97-98 [151 Cal.Rptr. 347, 587 P.2d 1160].) As expounded in *Cole,* one of those conditions is that plaintiff's emotional distress caused him disability. The record is bereft of any evidence as to whether plaintiff's disability was caused by his knee injury or by his emotional injuries. Nor is there any evidence establishing whether the workers' compensation benefits paid to plaintiff were on account of his knee injury or for his emotional injuries. In this regard, we find no evidentiary support for the conclusions reached by the trial court, as stated in its memorandum of October 17, 1986, that plaintiff's two workers' compensation claims filed prior to his knee injury have been "adjudicated," that "both temporary disability benefits and 'advances on permanent' disability have been made," and that "there has had to be 'necessarily included' in the WCAB adjudication that Jones' compensable injuries are solely industrially related." The record establishes simply that the three claims are pending and that some payments have been made, but not that the claims for emotional distress have been "adjudicated" or that payments have been made for these claims. Therefore, even were *Cole* to apply to this case, respondents have not made an adequate showing to bring themselves within its conditions for nonliability.

---

[2] The responding parties to plaintiff's appeal are District, Putren, Mason and Campbell, who are hereinafter referred to as respondents.

■ We reject respondents' argument that *Cole* is dispositive of the instant case. *Cole,* by its own limitation, has no application to the instant case where the claims are based on causes of action created by statute, the Fair Employment and Housing Act. (Gov. Code, § 12900 et seq.) The act prohibits, among other things, an employer from discriminating against a person in compensation or in terms, conditions or privileges of employment because of race (Gov. Code, § 12940, subd. (a)), and prohibits an employer or person from discriminating against any person because the person has opposed any practices forbidden under the act. (*Id.*, § 12940, subd. (f).) The opportunity to seek, obtain and hold employment without discrimination because of race is a civil right. (Gov. Code, § 12921.) Thus, the instant case presents issues of legislative policy and intent which were not addressed in *Cole.*

Although the parties have not brought to our attention any California state court decision which has addressed the issue of whether the exclusive remedy provisions of the Labor Code bar a statutory employment discrimination action, appellant did bring to the attention of the trial court the case of *Boscaglia* v. *Michigan Bell Tel. Co.* (1984) 420 Mich. 308 [362 N.W.2d 642], a case involving claims of sex discrimination and national origin discrimination prohibited by Michigan's civil rights statutes.

In holding that the exclusive remedy provision of the Michigan workers' compensation act does not bar an action seeking recovery for physical, mental, or emotional injury resulting from an employer's violation of the state's fair employment practices act or the state civil rights act, the court identified the different evils the acts were designed to remedy and concluded that the state Legislature did not intend that the objectives of the civil rights statutes would be defeated by the bar of the exclusive remedy provision of the workers' compensation act: "The evils at which the civil rights acts are aimed are different from those at which the workers' compensation act is directed. The workers' compensation act guards against the victims of industrial injuries being 'turned away empty handed' and 'unrecompensed' as a result of common-law tort doctrines such as contributory negligence and the fellow-servant rule. [Citation.] The civil rights acts are addressed to 'the prejudices and biases' one race, sex or religion bears against another. . . . We think it self-evident, however, assuming the Legislature in enacting the civil rights acts intended to provide compensation for physical, mental or emotional injury resulting from discrimination, that it did not intend that objective would be defeated by the bar of the exclusive remedy provision of the workers' compensation act. Whatever may have been the intention of the Legislature in enacting the exclusive remedy provision of the workers' compensation act, if it intended in enacting civil rights legislation that

workers discharged in violation of such legislation could recover for resulting physical, mental or emotional injury that intention would necessarily supersede or modify the scope of other legislation that otherwise would defeat the intent to permit such recovery." (*Boscaglia* v. *Michigan Bell Tel. Co., supra,* 362 N.W.2d at pp. 645-646.)

The court in *Boscaglia* also rejected the distinction drawn between disabling and nondisabling injuries as yielding anomalous results: "Where employment discrimination causes injuries that are not so severe as to culminate in disability, the injured employee would be permitted to sue his employer in tort and recover full damages; however, where the injuries suffered are so severe as to culminate in disability, the injured employee would be restricted to the recovery of workers' compensation benefits." (*Id.,* at p. 648.)

In addressing this issue, the Supreme Court of Washington agreed with the conclusion in *Boscaglia* and determined that there was no conflict between Washington's law against discrimination in employment and the exclusive remedy provisions of its workers' compensation law. (*Reese* v. *Sears, Roebuck & Co.* (1987) 107 Wn.2d 563 [731 P.2d 497, 502].) In concluding the Legislature's intent is upheld by protecting the integrity of both statutory schemes, the court stated, "Appellants claim to have suffered two separate injuries—a workplace physical injury and a subsequent injury arising from the employers' alleged handicap discrimination. Because the injuries (1) are of a different nature, (2) must arise at different times in the employee's work history, and (3) require different causal factors . . . the two injuries cannot be 'the same injury.'" (*Id.,* at p. 503.)

Although there may be differences between the California workers' compensation laws and those of Michigan and Washington, we find the analysis in *Boscaglia* and *Reese* persuasive and equally applicable to the instant case. The California Legislature expressly requires that the Fair Employment and Housing Act be "construed liberally for the accomplishment of the purposes thereof." (Gov. Code, § 12993.) Moreover, the legislative findings and declarations of policy recognize that the practice of denying employment opportunity and discrimination in the terms of employment on account of race, among other things, "foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advance, and substantially and adversely affects the interests of employees, employers, and the public in general." (Gov. Code, § 12920.) The purpose of the Act is "to provide effective remedies which will eliminate such discriminatory practices." (*Ibid.*)

In the context of the facts of this case, where plaintiff claims that he was forced to suffer racial insults of a coworker and in retaliation for complaining of such treatment was monitored in his work and given more onerous tasks while the White coworker simply stayed away from work, and where he ultimately suffered a knee injury which apparently caused him to become disabled, the application of the exclusivity provision of the Labor Code would in effect result in no recognition of or compensation for the humiliation and other injuries which Jones suffered before his knee injury. A failure to recognize a cause of action under such circumstances also furthers a policy in *favor* of discrimination in the workplace. Because two separate wrongs are involved, there are no election of remedies or double recovery problems. Moreover, any possible double recovery in the instant case can easily be avoided. As Jones's claims are not barred by the Labor Code, the trial court's ruling as to this issue was in error. We proceed to examine respondents' arguments as to their other defenses. Although the trial court did not base its decision on these other defenses, they were raised by the motion and Jones had an opportunity to present opposition, so we may consider them.

### III

#### FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

Respondents claim, as they did in their motion in the trial court, that because Jones filed his complaint with the DFEH in February 1983, over one year after Bronder's last day of work with the District on November 19, 1981, and because November 19, 1981, was "the last possible date upon which any racial harassment or racially segregated or unfair job assignments could have occurred," the trial court was without jurisdiction to adjudicate those claims as well as his claim regarding his first request for a transfer in April 1981. Respondents rely on Government Code section 12960.

Despite the fact that some of the conduct of which Jones complains did occur over a year before he filed his DFEH complaint, our record reveals that as early as October 1982 plaintiff was engaged in pursuing, and indeed was encouraged by the District to pursue, internal administrative remedies for his discrimination claims with the District itself. After filing his DFEH complaint, our record does not indicate that respondents raised the one-year limitation in Government Code 12960 before the department and the only inference from our record is that the department did investigate the complaint and did address it on its merits. Therefore, Jones did exhaust his administrative remedies and the trial court was authorized to adjudicate his

claims. Respondents do *not* claim that Jones's complaint in the trial court is barred by any applicable statute of limitations, but only that Jones did not exhaust his administrative remedies. The record does not support the latter contention.

 In a related argument, respondents argue, in a hypothetical manner, that to the extent that factual bases exist for his claims of discrimination other than those fairly reflected in Jones's DFEH complaint, those other unspecified bases are barred by the failure to exhaust administrative remedies. Respondents do not specifically identify any allegations in the complaint or any other claims made by Jones which are purportedly not fairly reflected in the DFEH complaint. ██ ██ Aside from the fact that such a factually disembodied and hypothetical legal proposition is inappropriate for summary judgment or summary adjudication, we note that "allegations in a complaint [before the FEPC, the predecessor agency to the DFEH] serve no purpose other than to get an investigation in motion." (*Marshall* v. *Fair Employment Practice Com.* (1971) 21 Cal.App.3d 680, 684 [98 Cal.Rptr. 698].) Significantly, if the DFEH decides to issue an accusation, the accusation "shall set forth the nature of the charges . . . and shall require the respondent to answer the charges at a hearing." (Gov. Code, § 12965, subd. (a).) Thus, it is erroneous to assume, as respondents do, that because precise actions claiming to constitute racial discrimination may not be specifically mentioned in a DFEH complaint, the Department cannot investigate them and could not issue an accusation based on the results of its investigation. Although no accusation was issued in the instant case, there is no evidence that the Department did not investigate all claims reflected in Jones's superior court complaint. We conclude that respondents' claims that appellant failed to exhaust administrative remedies are without evidentiary support in the record.

IV

RACIAL DISCRIMINATION CLAIMS

 Respondents argue that summary judgment is proper in the instant case because Jones's opposition did not create any triable issues of fact and their evidence established that they took all reasonable steps to see that Jones was not subjected to discrimination, including dismissal of Bronder; Jones was not given more onerous job assignments because of his race; he was never suspended nor given a poor evaluation; and respondents never attempted to prevent Jones from transferring to another campus. We agree with appellant that whether respondents' response to the problems with Bronder was reasonable is an issue which is more properly resolved by a

jury rather than on summary judgment. For example, a jury could reasonably conclude that respondents' decision to try and change Bronder's behavior and to allow over five months to go by before trying to separate Bronder from Jones was unreasonable and that respondents reasonably should have immediately made an affirmative effort to find another painter in the District who would be willing to transfer so Jones could go to another campus. Thus, although respondents may be correct that no dispute of fact exists that they did not thwart Jones's attempts to try to transfer to another campus, that fact in isolation does not go very far if a reasonable inference from the facts can be drawn that in order to resolve the problem with Bronder, respondents should have made an affirmative effort to bring about such a transfer rather than to force Jones to endure Bronder's abuse for such a prolonged period of time.

We also find respondents' declarations too conclusory to support their claim that there is no dispute of fact that the motivation for Jones's job assignments was not racial discrimination or retaliation. Putren's declaration in support of the summary judgment motion states that he has never given Jones any assignment because of his race or in retaliation for his complaints and that he gave Jones more difficult and responsible jobs than were given to Bronder or any of the temporary painters because Jones did not need as much supervision due to his skill and experience. Putren also conclusorily states that all of Jones's job assignments were within the scope of his job description, but he does not describe what the job assignments actually were nor what time deadlines were placed on Jones. None of the declarations in support of the motion specifically addresses the following allegations in the complaint or in Jones's declaration in opposition to the motion: (1) Jones was not treated similarly to White painters in that, although he requested assistance, he was not assisted in the set-up or removal of equipment from the job site while White painters were. (2) Jones was repeatedly reprimanded by Putren and others for alleged poor and unacceptable work when they knew or should have known that the work was performed by another employee. (3) Putren and Bronder would discuss Jones and his race in a derogatory manner in Jones's presence, and without any basis for such accusation, accused him of pilfering. (4) Bronder was allowed to stay away from campus and get paid for it, while Jones did his job. (5) During the course of seeking administrative relief within the District, he was retaliated against by being assigned to a more rigorous position in the field rather than to the paint shop, where a temporary painter was assigned instead of him; he was also required to work at demanding paces and to ignore safety measures. (6) Defendants also unnecessarily and unfairly increased administrative requirements for the pursuit of his administra-

tive remedies beyond that normally required in order to pressure and prevent the exercise of his rights before the appropriate commissions.

Although Putren admits being critical of Jones's job performance on particular jobs that Putren claimed were not as neat as he expected, Putren declares that he never took any disciplinary action against Jones and evaluated his performance as meeting or exceeding work standards on written evaluations. His declaration does not go far enough, however, in negating the allegations that Jones was subjected to unfair and unjust *verbal* criticisms and abuse because of his race. Moreover, although Putren denies any racial motivation for his actions, the trial court denied summary adjudication of the issue that the terms and conditions of Jones's employment were not adversely affected because of his race. The trial court here apparently exercised its discretion under Code of Civil Procedure section 437c, subdivision (c), in denying summary judgment "based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact." Subdivision (e) of section 437c also gives the court discretion to deny summary judgment where "a material fact is an individual's state of mind, or lack thereof, and that fact is sought to be established solely by the individual's affirmation thereof."

While respondents may be correct that this record shows no dispute of fact that Jones was not formally suspended in September 1982, respondents, who have the burden of proof on summary judgment, have failed to explain Jones's absence from work from September 16 to September 23, when Jones was granted an illness leave until October 20, 1982. All our record shows is that Jones left a September 16 meeting in Campbell's office, which meeting respondents intended to record on tape. The events at such meeting are clearly in dispute. Then Jones apparently came back and spoke to Campbell and then Putren, telling Putren that he did not know whether he would come to work the next day. Nothing in our record explains what happened at the second meeting between Jones and Campbell and why Jones did not come into work for several days before going on illness leave. Jones claimed that he found out that he was suspended when he came to the first meeting on September 16, but it is unclear from what facts he reaches such conclusion. While the fact that Jones was not formally suspended is without dispute on this record, it is simply one detail in an entire sequence of events which are not fully explained. Depending on those facts, the issue of formal suspension may or may not be a material fact significant to the case. **(12)** Respondents charge Jones with failing to provide evidentiary facts and claim that they are entitled to summary judgment as a matter of law because Jones failed to create any triable issue of fact. This argument is without merit, as the burden is on them to provide the evidence to show

that there is no triable issue of fact and that they are entitled to judgment as a matter of law. We conclude that they have not met that burden.

V

LIABILITY OF MASON, PUTREN AND CAMPBELL

One of the issues adjudicated by the trial court is that "Defendants William Putren, Dr. J. Quentin Mason, and Charles Campbell are not individually liable for any of the acts alleged in this action and they are therefore dismissed from the action." Respondents frame the issue in their reply brief as follows: "Insofar as defendants Mason, Putren and Campbell are sued for acts taken in their individual or private capacity, they cannot also have been acting as 'employers' and, therefore, cannot be liable for employment discrimination." As framed by respondents, the issue is not one which raises any triable issue of fact as it is abstract and hypothetical and is not based on any actual facts. Moreover, the complaint clearly alleges that the defendants were indeed acting within the course and scope of employment. Despite the abstract and hypothetical manner in which respondents frame the issue, which is not consistent with the way it is framed by the trial court's order, we address the issue as framed by the trial court.

To support their contention, respondents cite Government Code sections "140 and 126(c)" which we take to be clerical error as these sections have nothing to do with employers or with discrimination, and which we instead interpret as references to sections 12940 and 12926, subdivision (c). The latter section defines employer as including "any person regularly employing five or more persons, or any person acting as an agent of an employer, directly or indirectly . . . ." No evidence was presented to negate the allegations that the individuals were acting as agents for the District, so it was improper for the court to grant summary adjudication of this issue. Respondents also argue in conclusory fashion that in employment discrimination litigation awards are paid by the employer. Without addressing the correctness of this assertion, we note that it does not logically follow from it that they cannot be sued and liable for any judgment against them. Even assuming that the District is a public entity and the individuals are public employees within the purview of Government Code section 825, that section does not provide that the employees are immune from liability, but only that under certain circumstances, the public entity is obligated to pay a judgment against the employee arising out of an act or omission occurring within the scope of his employment as an employee.

## CROSS-APPEAL

 Respondents purport to "cross-appeal" from that part of the August 14, 1986, order denying their motion for summary judgment. Inasmuch as we deem that order, along with the subsequent one denying the motion for reconsideration, to constitute a final judgment in respondents' favor, they are not aggrieved by such order and have no standing to cross-appeal from it. Although we dismiss the cross-appeal, respondents are not prejudiced in any way because we discuss all of their contentions made under their purported cross-appeal in the context of our review of the appeal from the summary judgment.

## DISPOSITION

The judgment (orders of Aug. 14, 1986, and Oct. 17, 1986) is reversed. The cross-appeal is dismissed. Appellant is entitled to recover his costs on appeal.

Thompson, J., and Johnson, J., concurred.

A petition for a rehearing was denied March 14, 1988, and the petition of defendants and appellants for review by the Supreme Court was denied May 26, 1988.